**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1258-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DONNELL GIDEON,

    Defendant-Appellant.

_____

> Argued April 29, 2019 – Decided June 7, 2019
>
> Before Judges Sabatino, Mitterhoff and Susswein.
>
> On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 05-10-4097.
>
> Alan Dexter Bowman argued the cause for appellant.
>
> Linda Anne Shashoua, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Linda Anne Shashoua, of counsel and on the brief).

PER CURIAM

Defendant Donnell Gideon was convicted by a jury as an accomplice to a homicide. He now appeals the denial of his application for post-conviction relief (PCR) based on a claim of ineffective assistance of counsel. Defendant contends that he was prejudiced by his counsel's failure to call his mother and girlfriend as alibi witnesses at his July 2007 murder trial.

This case comes back to this court after two PCR remand hearings that were heard by two different judges. The State previously acknowledged that defense counsel's performance at trial was constitutionally deficient and so it is no longer disputed in this litigation that defendant has established the first prong of the two-part PCR test announced in Strickland v. Washington, 466 U.S. 668 (1984). The only issue before us in this appeal is whether defendant has satisfied the second prong of the Strickland test by establishing to a reasonable degree of probability that defense counsel's deficient performance actually prejudiced the accused's defense.

We have considered the contentions of both defendant and the State on appeal in light of the record and governing legal principles. The additional testimony of defendant's girlfriend, if believed by the jury, would have strengthened defendant's alibi defense and thus would have been invaluable to defendant at trial. We therefore are satisfied that it is reasonably probable that

had a fully-developed, carefully-constructed alibi defense been presented on defendant's behalf, the result of the trial would have been different. Accordingly, we reverse the denial of PCR and remand the case for a new trial.

I.

This case has a long and tortuous procedural history. Defendant was tried for murder in July 2007. He was acquitted of first-degree murder but convicted of the lesser-included offense of aggravated manslaughter. He also was convicted of attempted murder, multiple counts of aggravated assault, conspiracy, possession of a weapon for unlawful purposes, and hindering apprehension. Defendant was sentenced to an aggregate twenty-seven-year prison term subject to the eighty-five percent parole ineligibility term mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2(a).

On direct appeal, this court affirmed defendant's conviction and sentence in an unpublished opinion, State v. Gideon, No. A-2132-07 (App. Div. Oct. 18, 2010), and the Supreme Court denied defendant's petition for certification, State v. Gideon, 205 N.J. 273 (2011).

Defendant filed a petition for PCR in April 2012 and oral argument on that petition was heard by the trial judge in August 2013. Defendant argued that his trial counsel was ineffective because he failed to request an adjournment of

3

the trial to investigate possible alibi witnesses revealed in the course of defendant's trial testimony. In support of the belated alibi claim in his petition, defendant submitted two certifications, one from his mother, Bianca Gideon-Nichols, and one from his girlfriend, Sahleeha Bey. Both certifications stated that defendant was home on the night of the shooting.

On August 14, 2013, the trial judge issued a written decision denying defendant's petition for PCR without an evidentiary hearing. The PCR court concluded that defendant did not satisfy the first prong under Strickland. The court reasoned that trial counsel had made a strategic decision not to call the two alibi witnesses in light of inconsistencies between the alibi witnesses' version of events and the defendant's trial testimony. The court also found that the certifications submitted by Gideon-Nichols and Bey were not credible.

Defendant appealed the denial of PCR and on February 10, 2016, in an unpublished opinion, this court remanded the case for an evidentiary hearing. State v. Gideon, No. A-0293-13 (App. Div. Feb. 10, 2016). The remand hearing was held on September 13, 2016. Gideon-Nichols and Bey testified that they were at home with defendant on the night of the shooting. Defendant's trial counsel also testified and acknowledged that he had not made a strategic

4                                                                    A-1258-17T4

decision when he failed to investigate the potential alibi testimony suggested by his client's trial testimony.

On October 11, 2016, the PCR judge issued a written decision granting PCR and ordering a new trial, even though he found that the testimony of the two alibi witnesses was not credible. The PCR court did not articulate a basis for establishing the second prong of the two-part test announced in Strickland, which prompted the State to appeal. We remanded the case yet again, instructing the PCR court to determine pursuant to Strickland whether defendant had suffered prejudice from his counsel's unprofessional error. State v. Gideon, No. A-1249-16 (App. Div. June 6, 2017).

The initial PCR judge was not available to hear the second remand and so another judge was assigned. On July 25, 2017, the second remand judge issued a written opinion denying defendant's petition. On August 30, 2017, the second PCR judge issued an oral decision denying defendant's motion for reconsideration of the denial of defendant's petition for PCR. Defendant now appeals the second PCR court's ruling.

A-1258-17T4

## II.

### A. Trial Evidence

This case arises from gun violence that erupted in the City of Camden in the summer of 2004, when drug dealers attempted to assassinate a competitor. The intended target was not even present when the assailants opened fire with an assault rifle and shotgun in an alleyway, killing Joseph Fields and wounding three other unintended victims. This particular appeal requires us to consider the strength of the evidence the State presented at trial to prove that defendant was present at the shooting and not at home as he claimed. For that reason, we discuss the trial evidence in some detail.

It was not disputed at trial that in July 2004 defendant sold marijuana in Camden near a one-block area known as Yorkship Square. Defendant routinely obtained large quantities of marijuana from his supplier, Eric Jackman. Defendant would deliver the marijuana to his "workers" to sell in Yorkship Square. Those workers informed defendant that another drug dealer, Tony "Tone" Alford, had robbed them on a number of occasions. Alford admitted in his trial testimony that he had indeed robbed defendant's subordinates in Yorkship Square.

It also was not disputed at trial that on the afternoon of July 17, 2004 defendant confronted Alford about the robberies. That encounter escalated into a fistfight. Both defendant and Alford described the fight as being "quick" and both testified that neither of them suffered injury.

Alford testified that shortly after defendant left the area, Alford grabbed his gun, got into a car with "his people" and "rolled up" on defendant. Defendant's testimony was essentially consistent with Alford's testimony; defendant left the scene of the fistfight and headed back to his mother's house, where defendant resided. Alford stopped defendant while he was on his way home and asked him "What's up? Where are you going?" According to both Alford and defendant, defendant replied that he was going home. Alford said "all right" and then drove back towards Yorkship Square.

Defendant testified that, as he was on his way home, he saw his mother driving her vehicle. Defendant recounted the next sequence of events as follows:

> So as I went home, I had seen my mom. My mom heard that I was fighting . . . she asked me[,] was I fighting. I told her who I was fighting. She said, what are you doing out here fighting? What is you all doing fighting? I said, it wasn't about nothing, you know, or whatever. And then she said, all right. Well, I'm taking you around there. I want to see what was going on.

So as we rode around there, we sees Tone [Alford]. My mom calls Tone [over] and my mom said, why are you fighting my son? He said, nah, it wasn't about nothing. It was a little misunderstanding, and she was like, well, you all better show me it's a misunderstanding. Shake hands. We shook hands.

My mom said, I don't want to hear nothing about you all fighting no more. He said, all right. I'll talk to you later. I said, all right, talk, too. It was peaced up. Everything was over. After that, I got back in the car. My mom took me home. She went to work. I stayed in the house.

Alford recounted a similar sequence of events in his testimony, explaining: "[s]o that's when I went around [back to] the Square and he came back with him [sic] moms and she asked what we out there fighting for. I said, we fighting for something dumb. Then we shook hands, everybody, oh, peace the beef up."

Although there was little if any dispute at trial as to the circumstances of the initial fistfight and the reconciliation orchestrated by defendant's mother, the State and defense versions diverge as to what happened next. The State introduced a statement[1] that defendant gave to detectives investigating the

---

[1] The defendant moved to suppress his recorded statement, claiming that he was under the influence of marijuana and alcohol when he was questioned and alleging that the police coached him on what to say. The trial judge after a hearing denied the motion to suppress, concluding that defendant's statement had been given voluntarily and knowingly.

shooting. The statement was electronically recorded and was played to the jury. In that statement, defendant said that he went home and immediately called Eric Jackman, his drug supplier, to explain what had transpired with Alford. Jackman told defendant that he would handle the situation with Alford himself.

At some point later that day, Jackman arrived at defendant's home and told defendant to "suit up" and "get your black on," meaning to change into black clothing. Defendant then got into a car with Jackman and another individual and drove through Yorkship Square looking for Alford. They thought they had found Alford standing on a corner near the Yorkship Square area. They parked the car and Jackman and the other individual exited while carrying an AK-47 assault rifle and a Mossberg shotgun. The three individuals then walked down an alleyway. Defendant asked Jackman "yo, what's up?" Jackman responded "just look up." At that moment, defendant heard gunshots.

After the gunfire ceased, the three got back into the car and Jackman and the other individual hid the guns behind an abandoned house. Jackman then dropped defendant off at his mother's house. Defendant claimed in his statement "he never knew what was gonna happen . . . . And I never meant for nobody to get hurt like the way they did."

A-1258-17T4

Only one prosecution witness, Vinny Robinson, testified that defendant was present at the shooting. Robinson was a drug dealer who sold controlled substances in the alleyway adjacent to his home, which is where the shooting occurred. Robinson acknowledged that Alford was his friend and "protected" him from other drug dealers. Robinson testified that he stashed his drugs in the back of the alleyway. While he was "servicing" a customer, Robinson saw three individuals approaching who were wearing all black and who appeared to be carrying guns. When Robinson saw the three individuals "loading up," he believed that he was about to be robbed and he fled. When questioned by police weeks later, Robinson identified defendant as one of the three individuals dressed in black who entered the alleyway.

On cross-examination, defense counsel sought to discredit Robinson's testimony by highlighting that Robinson and Alford were friends and that Robinson had witnessed the fight between defendant and Alford earlier the day. Defense counsel questioned why Robinson had waited nearly a month to tell police what he had seen moments before shots were fired. Defense counsel also suggested through his questioning that Robinson was never charged with any drug offenses because he helped to identify defendant as a possible shooter. Defense counsel also challenged Robinson's ability to identify defendant given

10

that Robinson was at the back of the alleyway and the three individuals were still on the other side of the alleyway when Robinson fled.

Defendant testified that he was not involved in the shooting incident at Yorkship Square. Defendant maintained that after his quarrel with Alford he went home, which was his mother's house, and remained there for the rest of the night with his girlfriend. He claimed that he first learned about the shooting the next day.

When asked about the statement he had provided to police, defendant insisted that he had been "coached" by detectives and was "told . . . what to say." Defendant explained:

> [The detectives] told me that . . . if I can tell them that somebody else did the shooting and that I could place myself there just as a witness, that I wouldn't be locked up, that I'd be able to go home that night, and that everything wouldn't fall on me.
>
> They told me that other people was trying to blame it on me, such as Tone [Tony Alford], such as Vinny [Robinson]. They told me that, if you don't want to get locked up for this, tell us what we want you to – what we want to hear. I said, I told you already. I don't got nothing to do with it. And that's when they was like, look, well, we got something to tell you and you can't go home, just by – feeding me what they fed me on the taped statement.

The two potential alibi witnesses, defendant's mother, Bianca Gideon-Nichols, and defendant's girlfriend, Sahleeha Bey, testified at the evidentiary hearing on the first PCR remand. We set forth the key aspects of their testimony to facilitate our analysis of the potential impact that one or both of them might have had if they had been called as trial witnesses.

## B. Testimony at Evidentiary Hearing

### (1) Gideon-Nichols

Gideon-Nichols testified that on July 17, 2004 she received a phone call informing her that her son had been in a fight with a man named "Tone." After receiving the phone call, she and Bey – who was residing at Gideon-Nichols' house at the time – got into Gideon-Nichols' car and went to the location where the fight had taken place. According to Gideon-Nichols, upon arriving she saw her son and Alford sitting on a step, talking. Gideon-Nichols approached defendant and Alford and asked them if it "was over with." Both defendant and Alford responded in the affirmative, and then shook hands. Defendant and his mother then got into his mother's car.

Gideon-Nichols testified that after returning to the car, she, Bey, and defendant stopped at a corner store to purchase food for dinner. Afterwards, the three arrived back at the house, whereupon Gideon-Nichols finished cooking

dinner and all three of them watched television for the remainder of the night. Gideon-Nichols was supposed to go to work that night, but, according to her testimony, she did not go to work and instead spent the entire night at home. Gideon-Nichols testified that Bey and defendant eventually went upstairs to bed, but Bey was sick and kept vomiting because she was pregnant. Gideon-Nichols checked in on Bey all night, and was concerned that they might have to take her to the hospital.

(2) Sahleeha Bey

Bey testified that at the time of the shooting, she and defendant were dating and were expecting a child together.[2] She found out she was pregnant a few days before the shooting and was "always sick." She was laying on the couch watching television when Gideon-Nichols received a phone call about defendant being in a fight. She and Gideon-Nichols then got into Gideon-Nichols' vehicle and drove to the location where the fight had taken place. Bey testified that she saw defendant and Alford sitting on the step. According to Bey, Gideon-Nichols got out of the vehicle, but she stayed in the car. Bey saw

_____

[2] The record does not indicate whether defendant and Bey were still dating at the time of the trial or the remand hearing. The record therefore does not show whether defendant and Bey were in a loving relationship at the time she would have testified, or whether their relationship had deteriorated since the time of the shooting.

Gideon-Nichols talking to defendant and Alford. Soon after, defendant and Alford shook hands, and Gideon-Nichols and defendant got into the vehicle with Bey. Bey also testified that they stopped at a grocery store on the way home. According to Bey, after purchasing the food, they all went back to the house and Gideon-Nichols cooked dinner. After eating, all three watched television for the remainder of the night. Bey was "up and down the steps" because she was vomiting. Eventually, Bey and defendant went to bed. Bey testified that she was certain that defendant did not leave the house that night.

C. First PCR Judge's Credibility Findings and Decision

The trial judge found that Gideon-Nichols was not a credible witness, explaining in his written decision:

> Ms. Gideon-Nichols is the mother of the petitioner. She loves him very much and would do whatever she had to do for her son. The court had the opportunity to observe her demeanor and determine her credibility. She has failed to comply with society's rules as demonstrated through an indictable conviction[3] and would be more likely to ignore the oath requiring truthfulness on the witness stand than a person who has never been convicted of a crime. While testifying she seemed rehearsed and not testifying as to her memory.

---

[3]  The prosecutor elicited during cross-examination that Gideon-Nichols had been convicted in 1993 for "possession of CDS" and had violated probation.

The judge's credibility finding was strongly influenced by discrepancies between Gideon-Nichols' hearing testimony and defendant's trial testimony. The court observed:

> Ms. Gideon-Nichols' certification and her testimony at the evidentiary hearing regarding petitioner's whereabouts at the time of the killing are wholly contradictory to petitioner's trial testimony. The facts she alleged at the evidentiary hearing cannot be found to be credible.

The judge later in his written decision reiterated, "[g]iven the many inconsistencies between Ms. Gideon-Nichols' testimony at the evidentiary hearing and petitioner's trial testimony, this [c]ourt finds her testimony not believable."

Additionally, the judge also found that Bey's testimony at the evidentiary hearing was not believable. Although the judge stated in his written decision that he "had the opportunity to observe the witness testify and determine the credibility of the witness," he did not specifically describe Bey's demeanor on the witness stand, and did not mention, for example, that Bey's testimony seemed rehearsed, as the court had observed with respect to Gideon-Nichol's demeanor. Also in contrast to his findings with respect to Gideon-Nichols, the judge did not comment on whether defendant and Bey were still in a loving relationship. The judge noted only that defendant is the father of Bey's child.

15

See footnote 2.  The judge also commented that Bey could not remember when she had signed the certification.  The judge's assessment of Bey's credibility nonetheless appears to have focused chiefly on the discrepancies between her testimony and defendant's trial testimony.

The judge specifically identified the inconsistencies between both alibi witnesses' hearing testimony and defendant's trial testimony.  We summarize and catalogue the PCR judge's detailed articulation of these inconsistencies as follows:

- Gideon-Nichols and Bey testified that they arrived at the scene of the fistfight and found defendant and Alford sitting on a step talking to each other.

  Defendant testified that he was already on his way home when he saw his mother, who drove him back to the scene of the fistfight.

- Gideon-Nichols testified that she asked both her son and Alford whether the fight was over and they both said "yeah," at which point they shook hands.

  Defendant testified that his mother asked him if he had been fighting, and who he had been fighting with.  She then drove him back to the scene of the fight so that defendant and Alford could make peace.

- Gideon-Nichols and Bey testified that Bey was in the vehicle.

  Defendant did not mention in his trial testimony that Bey was also in the vehicle.

16

- Gideon-Nichols and Bey testified that before going home, they went to a store to pick up food for dinner.

  Defendant did not mention in his trial testimony that they stopped at a grocery store before going home.

- Gideon-Nichols and Bey testified that they all went back to the house, ate dinner, and then watched television for the remainder of the evening.

  Defendant did not mention in his trial testimony that they ate dinner together or watched television.

- Gideon Nichols testified that while she was supposed to go to work that night, she elected to stay home and kept a watch on Bey, who was vomiting because of her early-stage pregnancy.

  Defendant testified that his mother dropped him off at the house and then went to work.

D. Second PCR Judge's Findings and Decision

The second remand was heard by another judge because the first PCR judge was not available. The second PCR judge adopted the credibility and factual findings that had been made by the first PCR judge following the September 2016 evidentiary hearing. On July 25, 2017, the second PCR judge issued a written decision, holding that defendant was not prejudiced by his trial counsel's failure to investigate the potential additional alibi testimony.

The second PCR judge explained:

[T]he testimony of these two witnesses would not only have served as an attack on the testimony of defendant which had already been presented to the jury, but if anything would have increased the likelihood of conviction based upon those discrepancies. The presentation of such testimony at such a stage in the trial would have reflected desperation on the part of the defense and significantly increased the risk that defendant's testimony would be disbelieved. Additionally, since the testimony from these two witnesses at the PCR hearing contradicted defendant's testimony and prior statement, it is highly likely that the jury would have found both of these witnesses not to be credible as did [the first PCR judge] at the PCR hearing.

[D]efendant has failed to establish that the performance of defense counsel prejudiced his defense or otherwise deprived him of a fair trial. To the contrary, even though the conduct of defense counsel was found to be ineffective in failing to follow-up with Bey once defendant disclosed during his cross-examination at trial that he had been with Ms. Bey, that conduct ultimately prevented a situation where the testimony of Ms. Bey would have substantially increased the likelihood that the jury would not believe the testimony already provided by defendant. Such testimony had a high risk that the jury would not find any defense witness credible.

III.

On appeal, defendant raises the following contentions:

POINT I: APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

18

POINT II: THIS COURT SHOULD REINSTATE THE
PCR COURT'S REMAND DECISION.

IV.

Post-conviction relief is New Jersey's analogue to the federal writ of habeas corpus. State v. Preciose, 129 N.J. 451, 459 (1992). It provides a built-in safeguard that ensures that a defendant is not unjustly convicted. State v. Nash, 212 N.J. 518, 540 (2013). Under the Sixth Amendment of the United States Constitution, a person accused of crimes is guaranteed the effective assistance of legal counsel in his or her defense. Strickland, 466 U.S. at 687. To establish a deprivation of that right, a convicted defendant who petitions for PCR must satisfy the two-part test enunciated in Strickland by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. Id. at 687; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-part test in New Jersey).

We need not discuss the wealth of case law that explains how to apply the first prong of Strickland. The State has acknowledged that defense counsel's performance was constitutionally deficient by failing to ask for a trial adjournment to investigate potential alibi testimony first revealed during the

19

course of defendant's trial testimony.[4] This appeal focuses solely on application of the second prong of the <u>Strickland</u> test, which requires a defendant to demonstrate a reasonable probability that the result of the trial would have been different had his counsel effectively represented him at trial. <u>Strickland</u>, 466 U.S. at 694; <u>Fritz</u>, 105 N.J. at 52. This is "an exacting standard: '[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached.'" <u>State v. Allegro</u>, 193 N.J. 352, 367 (2008) (quoting <u>State v. Castagna</u>, 187 N.J. 293, 315 (2006)).

The Supreme Court's decision in <u>State v. Pierre</u>, 223 N.J. 560 (2015), is particularly instructive on how we should apply the <u>Strickland</u> prejudice test because that PCR case also involved the failure to investigate and present witnesses to buttress an alibi defense to a homicide. Much of the Court's opinion focused on the second prong of the <u>Strickland</u> two-part test. The Court ultimately found in that case that a fully developed alibi defense, carefully

---

[4] There is no claim before us that defense counsel was ineffective in not learning about the potential alibi witnesses <u>before</u> trial. Because the professional error that we are evaluating for prejudice occurred <u>after</u> defendant testified, we do not consider what impact a properly investigated alibi defense might have had on defendant's election to testify. Our prejudice analysis in this case focuses solely on whether it is reasonably probable that the jury would have reached a different outcome if they had heard the testimony of one or both of the alibi witnesses after having already heard the testimony that defendant gave at the trial.

constructed on the defendant's behalf, would likely have altered the outcome of his trial. Id. at 585-86.

We interpret Pierre to establish two important legal principles that guide our second-prong analysis in the case before us. First, the Court explained that "[i]mportant to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial. '[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Id. at 583 (quoting Strickland, 466 U.S. at 696). In that case, the Court found that the State had not presented the "'overwhelming' proof against [the] alibi that was described by the PCR court." Id. at 586. The Supreme Court found to the contrary that the evidence presented at trial implicating Pierre in the shooting was "sparse." Id. at 584. The lack of compelling evidence of the defendant's presence at the scene, the Court observed, made "defendant's alibi far more significant than it would have been in the face of compelling evidence of guilt." Id. at 585.

The second legal principle we glean from Pierre – one that is especially important to the case before us – is that the testimony of an alibi witness does not have to be free of credibility issues for prejudice to be established; the testimony must simply have the ability to bolster the defense or refute the State's

21

position if believed by the jury.  Id. at 586-88.  That principle was underscored when the Supreme Court found that the testimony of one of the  potential alibi witnesses would have been invaluable to the defendant notwithstanding that the PCR judge had found that witness to be unconvincing.  Id. at 586.

Of particular note for purposes of the case presently before us, the Court in Pierre highlighted the "fundamental points" of that witness' testimony, referring to the specific facts the witness would have testified about that directly addressed the proofs the State had introduced at trial to refute the defendant's alibi defense.  Ibid.  The Court's emphasis on those "fundamental points" made by a witness found by the PCR judge to be "unconvincing" shows that when measuring the value of a potential witness' alibi testimony for purposes of Strickland analysis, the gravamen of the witness' testimony can be a more important circumstance than a consideration of the witness' credibility issues. Accordingly, a reviewing court should pay close attention to the portions of the potential testimony that relate directly to the critical question as to defendant's whereabouts.  A reviewing court should not just focus on non-fundamental matters that, while relevant to the witness' overall credibility, do not pertain directly to the central tenet of the alibi defense.  See, e.g., Allegro, 193 N.J. at 370 (finding no Strickland prejudice in trial counsel's failure to present

additional witnesses whose testimony "did not directly or tangentially address the States proofs.").

A.

We first address the strength of the State's evidence that placed defendant at the shooting scene, mindful that a verdict that is only weakly supported by the record is more likely to be affected by unprofessional errors than one with overwhelming support. Pierre, 223 N.J. at 583. Because the first PCR judge did not consider the strength of the State's evidence when he granted PCR and ordered a new trial, we do not have the benefit of his findings on this point, and thus no opportunity to afford deference to them. There is no reason, however, for yet another remand in this case. The second PCR judge did not preside over the trial and therefore is in no better position than we are to review the trial record. See State v. Elders, 192 N.J. 224, 244 (2007) ("An appellate court should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.").

The State's trial evidence placing defendant in the alleyway at the time of the shooting comes from only two sources: the recorded statement defendant gave to police, and the live testimony of Robinson at trial. The prosecutor's

closing argument to the jury relied heavily on defendant's admission that he went with Eric Jackman and another individual to the Yorkship Square area.[5]

Defendant testified on his own behalf and recanted his statement to police detectives, claiming it to be, essentially, a false confession. Defendant testified that he was told by detectives what to say in exchange for being allowed to go home. The trial judge charged the jury that they should take into consideration the circumstances in which the statement was made and further instructed them that if they determine that part or all of the statement is credible, they "may give what weight you feel is appropriate to the portion of the statement you find to be truthful and credible."

---

[5] The prosecutor in her summation argued:

> Obviously, there's different versions and that's why there's a trial, but I'd indicate to you that both the evidence and the witnesses, when you put together, and clearly, most importantly, the defendant's own statement that you heard it – heard twice, and I'm sure I'd certainly ask you to listen to it again, because then it will be next week [because of a trial recess], to listen to it again, and listen to it in connection with everything else you've heard.
>
> [Emphasis added].

The prosecutor thereafter referred repeatedly to defendant's statement throughout her summation.

Robinson's testimony was the only direct evidence presented by the State to corroborate defendant's admission that he was in the alleyway when the shots were fired. Defense counsel sought to impeach Robinson's credibility based on his personal and narcotics-business relationship with Alford, and also based on Robinson's personal interest in telling the police what they wanted to hear to avoid arrest and prosecution for his own drug distribution activities. The prosecutor in her summation candidly acknowledged, moreover, that there were issues with Robinson's demeanor on the witness stand, noting that he "wasn't comfortable" and was "reluctant."[6]

In gauging the strength of the State's case, we also consider the kinds of proof that were <u>not</u> adduced at trial. None of the shooting victims identified defendant as being on the scene. Tony Alford, the intended target of the reprisal

---

[6] The prosecutor in her closing argument commented,

> Now Vinny himself was reluctant as well. You saw he wasn't comfortable. Again, you – the Judge will kind of tell you that you can tell and assess the credibility of a witness by the way they – their demeanor. And I'd submit to you that he was really uncomfortable, because I'd submit that, you know, you just don't want to do this. You don't want to come forward, and you don't want to tell what you saw.

A-1258-17T4

violence, testified that he was not on the scene when the shooting occurred and so he provides no support for the State's position that defendant was there, and although a police officer on patrol nearby responded to the crime scene immediately after hearing the sound of gunfire, that officer did not observe the assailants or see their vehicle as it departed the scene. Nor did the State introduce any objective evidence that placed defendant at the scene of the shooting, or that refuted his claim that he was home all night, such as surveillance video or global position system (GPS) tracking evidence from a smartphone. In sum, the only direct evidence of defendant's whereabouts on the night of the shooting came from the conflicting accounts of two competing drug dealers, defendant and Robinson, each with their own credibility issues.

Case law provides no precise, mathematical formula for reviewing courts to use in measuring the strength of the State's case from a cold record. In Pierre, the Supreme Court's independent review of the trial record revealed "sparse evidence implicating defendant in the shooting." 223 N.J. at 584. From our review of the record before us, we are not prepared to say that the State's evidence was sparse or that the guilty verdict was only weakly supported by the State's proofs. We are not prepared to discount the evidential value of defendant's detailed incriminating statement that was played to the jury.

Although the State's proofs regarding defendant's presence in the alleyway are not sparse or indirect given his recorded statement, in view of the limited corroborating proofs concerning defendant's whereabouts, and considering defendant's explanation for his incriminating admissions to police, we are not prepared to say that the State's evidence concerning his whereabouts was overwhelming. As often is true in criminal cases that go to trial, this contest falls somewhere between the polar extremes of "sparse" and "overwhelming" evidence of guilt, presenting genuine fact disputes and witness credibility judgments that generally are left for juries to resolve. We must therefore measure the value of the potential alibi testimony of defendant's mother and girlfriend against a different strength-of-evidence benchmark than the one that applied in Pierre.

The Court in Pierre did not suggest that prejudice under Strickland can only be established in cases where the State's proofs are weak. Rather, the Court's point was that it is easier for a defendant to meet the Strickland prejudice threshold in such cases. In this instance, even though the State's proofs regarding defendant's location at the time of the crime are more substantial than they were in Pierre, we still find that the added value of the testimony of at least

27

one of the potential alibi witnesses, Bey, is sufficient to meet the <u>Strickland</u> prejudice test, for reasons that we address next.

B.

We turn finally to a consideration of the nature and potential impact of the discrepancies between the defendant's version of events and the versions offered by Gideon-Nichols and Bey in their remand-hearing testimony. This analysis is critical to our review in this case because the second PCR judge's ultimate conclusion that defendant was not prejudiced by counsel's unprofessional error was based principally on his determination that the testimony of defendant's mother and girlfriend would have conflicted with defendant's own trial testimony, thereby not only discrediting them as witnesses but also harming the defense by undermining defendant's own credibility as a trial witness.

We defer to the first PCR court's factual and credibility findings, which also were adopted by the second PCR court. <u>See</u> <u>Elders</u>, 192 N.J. at 244; <u>see also</u> <u>Nash</u>, 212 N.J. at 540 ("An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he [or she] has observed firsthand."). We nonetheless reach a different result in our <u>Strickland</u> prejudice calculus because we believe that the second PCR court overstated the importance of the discrepancies and therefore overestimated their

28

potential impact.  Pierre makes clear, after all, that prejudice under Strickland can be established notwithstanding credibility issues and even in the face of a trial court's explicit finding that a witness was unconvincing.  Most importantly, with one notable exception, the inconsistencies identified and relied upon by both PCR judges do not pertain directly to the critical question whether defendant was home throughout the night of the shooting.  As we have already noted, a reviewing court applying second-prong analysis should pay closer attention to the gravamen of the additional alibi testimony – its fundamental points – than to details that do not directly or tangentially address the critical question as to defendant's whereabouts.

Considering the first discrepancy that was identified:  defendant testified that after the fistfight, his mother intercepted him as he was travelling home.  Both Gideon-Nichols and Bey testified that defendant was still on the scene of the fistfight, sitting on a step talking to Alford when they arrived.  This discrepancy may relate in a general way to all three witnesses' ability to recall specific events on that date, and thus would be fair game for the prosecutor to explore on cross-examination.  Although that discrepancy may impact witness credibility, it does not directly impeach defendant, Gideon-Nichols, or Bey with respect to their common assertions that defendant went home after the fistfight

29

and ensuing reconciliation, and remained at home throughout the night. In other words, to use the <u>Pierre</u> Court's phraseology, this discrepancy does not pertain to a "fundamental point" of the alibi defense.

Furthermore, some of the discrepancies do not even constitute true contradictions, much less fundamental ones. For example, defendant did not mention in his testimony that Bey was also in the vehicle, or that they stopped at a grocery store on the way home to pick up food, or that that they ate dinner and watched television while at home on the night of the shooting. The defendant's abbreviated version does not necessarily contradict the other witnesses' testimony, but rather reflects a different level of detail in their accounts. <u>See</u> <u>State v. Carty</u>, 170 N.J. 632, 647-48 (2002) (in assessing whether vehicle occupants' conflicting statements supported reasonable suspicion to believe that a search would reveal criminal evidence, the Court noted that defendant's and driver's stories did not conflict; rather, "the defendant merely gave a more detailed explanation of where they had been than the explanation given by the driver.").

There is, however, one discrepancy that was far more significant. Defendant testified that after the fistfight his mother dropped him off at home and then went to work. Gideon-Nichols testified that she was supposed to go to

work that night, but stayed home. If defendant's version were believed by the jury, then Gideon-Nichols would not have been able to establish an alibi for the crime committed that night. We therefore view this particular discrepancy as fundamental for purposes of prejudice analysis because it relates directly to Gideon-Nichol's ability to know defendant's whereabouts when the shooting occurred.

However, this particular discrepancy only impacts Gideon-Nichols' testimony; it has no bearing on <u>Bey</u>'s testimony that she was with defendant all night and was certain that he did not leave the house. The State presented no evidence at the remand hearing to refute that Bey was at home, and her testimony seems to be perfectly aligned with defendant's trial testimony on the fundamental point that they spent the entire night together.

That circumstance is critical to our conclusion that defendant suffered prejudice from his counsel's unprofessional error because it demonstrates that Bey's potential testimony by itself could have strengthened defendant's alibi claim. Because Bey's testimony standing alone, if believed by the jury, would have been invaluable to the defendant, it does not matter to the outcome of this appeal whether defendant suffered additional prejudice from his attorney's failure to investigate and present Gideon-Nichol's testimony. Defense counsel,

31

after all, would not have been obliged to present both alibi witnesses to the jury. In carefully constructing an alibi defense on defendant's behalf, defense counsel would have been free to call Bey as a trial witness, and not Gideon-Nichols, if counsel determined as a matter of trial strategy that defendant's alibi defense would be stronger if it relied solely on Bey's additional testimony.

It bears repeating at this point that the first PCR judge did not suggest that Bey's hearing testimony seemed to be rehearsed as he had found with respect to Gideon-Nichols' testimony. The judge did not make an explicit finding that Bey continued to have a loving relationship with defendant as he had found with respect to defendant's mother. Bey had not previously been convicted of a crime as had Gideon-Nichols. In short, the value of Bey's potential alibi testimony, considering both the fundamental point it addressed and her overall credibility, is markedly different from the value of Gideon-Nichols' testimony. As noted above, trial counsel was not obligated to present both alibi witnesses.

V.

In the absence of objective proof of defendant's whereabouts on the night of the shooting, such as video surveillance or GPS data, the outcome of the murder trial hinged on a credibility contest between two key witnesses, Vinny Robinson and defendant, who each had their own credibility issues. The

addition of Bey to that short list of trial witnesses who testified as to defendant's location at the time of the shooting would likely have altered the outcome.

To be sure, Bey could have been an unconvincing witness at trial based on the non-fundamental discrepancies with defendant's testimony, or based on as yet fully explored bias for defendant and motivation to fabricate alibi testimony on his behalf.  See footnote 2.  Notwithstanding her credibility issues, see Pierre, 223 N.J. at 587-88, if the jury believed her on the fundamental point that defendant was home with her that entire night, her testimony would have strengthened defendant's alibi defense and thus would have been invaluable to him by providing support for his own trial testimony that he was home with her and not in the alleyway near Yorkship Square when the shots were fired.  We therefore hold that defendant has made the required showing with respect to the second prong of the Strickland test.

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION